IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

KENNATH ARTEZ HENDERSON,

    Petitioner,

vs.

            No. 06-2050-STA-tmp

WAYNE CARPENTER, Warden,
Riverbend Maximum Security
Institution,

    Respondent.

---

**ORDER ON REMAND REGARDING <u>MARTINEZ</u> ISSUES**
**ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254**
**ORDER GRANTING LIMITED CERTIFICATE OF APPEALABILITY**
**AND**
**ORDER CERTIFYING LIMITED APPEAL WOULD BE TAKEN IN GOOD FAITH**

---

On July 11, 2012, this case was remanded for consideration of <u>Martinez v. Ryan</u>, ___ U.S. ___, ___, 132 S. Ct. 1309, (2012). (Electronic Case Filing ("ECF") No. 97.) The case was stayed awaiting the Supreme Court's holding in <u>Trevino v. Thaler</u>, ___ U.S. ___, 133 S. Ct. 1911 (2013). (ECF No. 114.) On July 25, 2013, Petitioner Kennath Henderson, through counsel, filed a brief about the applicability of <u>Martinez</u>. (ECF No. 116.) On September 10, 2013, Respondent filed a brief concerning procedural default and <u>Trevino</u>. (ECF No. 119.) On September 17, 2013, Petitioner filed his reply. (ECF No. 121.) On October 31, 2013, the Court directed the parties to further brief the <u>Martinez</u> issues. (ECF No. 123.) On

December 20, 2013, Petitioner filed a brief identifying his substantial claims under <u>Martinez</u> with multiple exhibits. (ECF No. 129-131.) On January 23, 2014, Respondent filed a notice regarding his brief concerning procedural default and <u>Trevino</u>. (ECF No. 132.)[1] On March 25, 2014, Petitioner filed a notice of supplemental authority. (ECF No. 133.)

In Petitioner's <u>Martinez</u> brief filed on July 25, 2013, he argues that <u>Martinez</u> was applicable to claims in Amended Petition ¶¶ 8(b, c, f, g, h, j, l); 9(c, d, e, f, k, l, m, n, o, p, q, r); 10(a, b(4, 5, 11)); 11(a(in part), b, c, e, f); 13; and "unexhausted assertions of 'ineffective assistance of counsel as cause' for the default of other [unnamed] substantive constitutional claims." (ECF No. 116 at 13-14.) In the Court's October 31, 2013 order, the Court stated, "Petitioner has not specifically identified the claims he contends are subject to <u>Martinez</u> or argued whether those claims are substantial under <u>Martinez</u>." (ECF No. 123 at 1.) Petitioner was directed to file a brief "identifying the claims he contends are subject to <u>Martinez</u> and presenting any argument about the substantial nature of those claims." (<u>Id.</u> at 2.) Petitioner identified the claims that he contends are substantial in his brief filed on December 20, 2013. (ECF No. 129.) Petitioner has waived his <u>Martinez</u> argument as to

---

[1]     Respondent relied on his prior briefing. (ECF No. 132 at 2.)

any claim not identified in the December 20, 2013 brief as a "substantial" claim.

## I.  BACKGROUND

Petitioner was incarcerated in the Fayette County Jail serving sentences for felony escape and aggravated burglary. <u>Henderson v. State</u>, No. W2003-01545-CCAR3-PD, 2005 WL 1541855, at *1 (June 28, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005). On May 2, 1997, after Petitioner's girlfriend smuggled a .380 semi-automatic pistol into the jail, Deputy Tommy Bishop took Petitioner and another inmate Deloice Guy to dentist appointments at the office of Dr. John Cima. <u>Id.</u> Petitioner pulled the gun on Dr. Cima, and when Deputy Bishop responded to a call from Cima, Petitioner shot at Bishop grazing him and causing him to fall to the floor presumably unconscious. <u>Id.</u> at *2. Petitioner left the room and returned with the receptionist in his custody. <u>Id.</u> He took Bishop's pistol, money, credit cards, and Cima's truck keys; he then went back where Bishop was laying and shot him through the back of the head at point-blank range. <u>Id.</u> Petitioner attempted to take Cima and the receptionist as hostages, but they managed to escape when outside the building. <u>Id.</u> Petitioner was apprehended shortly afterward in Cima's truck. <u>Id.</u>

On July 6, 1998, after a continuance of the trial was granted, Petitioner pleaded guilty to first degree premeditated murder, two (2) counts of especially aggravated kidnapping, aggravated robbery, attempted especially aggravated kidnapping, aggravated assault, and

felonious escape. (*See* ECF No. 20-1 at PageID 714, 718, 722-727.)[2] *See* Henderson, 2005 WL 1541855, at *8. Petitioner waived his right to jury sentencing. (Id. at PageID 717.) After a capital sentencing hearing on July 13, 1998, the trial court imposed the death sentence for the murder count and an effective sentence of twenty-three (23) years in prison for the noncapital offenses. *See* Henderson v. State, No. W2003-01545-CCAR3-PD, 2005 WL 1541855, at *1 (June 28, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005). After a state court appeal and post-conviction proceedings, Petitioner filed a habeas petition in this Court.

On February 15, 2008, Respondent filed a motion for summary judgment in which he sought the dismissal of multiple claims based solely on procedural default. (ECF No. 55-1 at 6-38; *see also* ECF No. 68 at 5-6.) Petitioner filed a response to the motion on July 31, 2008. (ECF No. 68.) On March 2, 2011, the Court entered an order directing the parties to file "briefs on the merits of all issues for which Respondent only argued procedural default" no later than May 2, 2011. (ECF No. 70 at 1.) On March 30, 2011, the Court entered an order granting in part and denying in part Respondent's motion for summary judgment and denying the petition in part. (ECF No. 72.)

On April 18, 2011, Petitioner filed a motion to reconsider the Court's March 30, 2011 order in light of the "grant of certiorari

---

[2]    Citations to the state court record and exhibits are made using "PageID" numbers for ease of reference.

in *Maples v. Allen*, 586 F.3d 879 (11th Cir. 2009), *cert. granted sub nom. Maples v. Thomas*, 562 U.S. __ (2011)(U.S. No. 10-63); the granting of a stay of execution and leave to file an out-of-time rehearing petition in *Foster v. Texas*, U.S. No. 10-8317 (April 5, 2011); and the granting of a stay of execution in *Cook v. Arizona*, U.S. No. 10A955 (April 4, 2011)." (ECF No. 73 at 1.) Petitioner asserted that ineffective assistance of post-conviction counsel was the cause for the default of certain ineffective assistance of trial and appellate counsel claims and Petitioner's claim that his guilty plea and the waiver of a jury for sentencing was not made knowingly, intelligently, or voluntarily. (Id. at 1-5.) On May 4, 2011, the Court denied Petitioner's motion to reconsider. (ECF No. 78.)

On April 26, 2011, while the motion to reconsider was pending, Respondent filed his brief on the merits in support of summary judgment. (ECF No. 75.) On May 2, 2011, Petitioner filed a second response to the motion for summary judgment. (ECF No. 77.) At Petitioner's request, the Court allowed the parties to brief Petitioner's entitlement to an evidentiary hearing. (*See* ECF No. 80.) On October 11, 2011, the Court entered an order denying the motion for evidentiary hearing, denying the petition, and denying Petitioner's request for a stay of final judgment. (ECF No. 91.) The Court granted a limited certificate of appealability on the issues of ineffective assistance of counsel at sentencing (Amended

Petition ¶ 9) and Petitioner's incompetence to enter a guilty plea and waive jury sentencing (Amended Petition ¶ 13) and certified that a limited appeal would be taken in good faith. (ECF No. 91 at 95-96.)

Petitioner subsequently filed a motion to alter or amend judgment and to expand the certificate of appealability. (ECF No. 93.) The Court denied the motion on December 19, 2011. (ECF No. 95.)

## II. MARTINEZ

In 2012, the Supreme Court issued its decision in <u>Martinez</u>, ___ U.S. at ___, 132 S. Ct. at 1320, which recognized a narrow exception to the rule stated in <u>Coleman</u>[3], "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." <u>Martinez</u>, ___ U.S. at ___, 132 S. Ct. at 1320. The Supreme Court emphasized that "[t]he rule of <u>Coleman</u> governs in all but the limited circumstances recognized here. . . . It does not extend to attorney errors in other proceedings beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance

---

[3]     <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

at trial . . . ." Id. The requirements that must be satisfied to excuse a procedural default under Martinez are as follows:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

Trevino, ___ U.S. at ___, 133 S. Ct. at 1918 (2013) (emphasis and revisions in the original).

Martinez arose under an Arizona law that did not permit ineffective assistance claims to be raised on direct appeal. In the Supreme Court's subsequent decision in Trevino, ___ U.S. at ___, 133 S. Ct. at 1921, the Supreme Court extended its holding in Martinez to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." Thus, the decision in Trevino modified the fourth requirement stated for overcoming a procedural default.

Recently, the Sixth Circuit in Sutton v. Carpenter, 745 F.3d 787 (6th Cir. 2014), held that ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective.

## III. ANALYSIS

Petitioner seeks _Martinez_ relief for four categories of claims: (1) ineffective assistance of trial counsel claims previously found to be defaulted (Amended Petition ¶¶ 9(f)(1)(v) & 9(n)); (2) ineffective assistance of trial counsel claims for which the proof was defaulted (Amended Petition ¶¶ 8(h), 9(b, d(4), & h)); (3) ineffective assistance of appellate counsel claims (Amended Petition ¶ 10(b)(11)); and (4) substantive claims for which ineffective assistance of trial and appellate counsel are the cause for default (Amended Petition ¶¶ 8(a), 11(b), 12(a), 13, & 20). (_See_ ECF No. 129 at 5, 22, 23-27.) The Court will first address those claims on which there is question about whether they are in the scope of _Martinez._

### A. Claims For Which The Proof Was Defaulted (Amended Petition ¶¶ 8(h), 9(b, d(4), & h))

Petitioner argues that _Martinez_ applies to the ineffective assistance of trial counsel claims for which the proof was defaulted. (ECF No. 129 at 22.) Petitioner argues that the Court, prior to _Martinez_, found itself constrained from consideration of Petitioner's proof by the dictates of <u>Cullen v. Pinholster</u>, ___ U.S. at ___, 131 S. Ct. 1388 (2011). (<u>Id.</u>) Petitioner argues that <u>Martinez</u> applies where post-conviction counsel failed to develop the evidentiary basis for a claim of ineffective assistance during the initial review proceedings. (<u>Id.</u>) Petitioner contends that it is "irrational" to distinguish failing to properly assert a federal

claim and failing to properly develop the claim in state court. (Id.) Petitioner asserts that counsel failed to develop the proof now presented and incorporates by reference the proof in support of those claims as briefed in Petitioner's Second Response to the Respondent's Motion for Summary Judgment (ECF No. 77) for the ineffective assistance of trial counsel claims in Amended Petition ¶¶ 8(h), 9(b), 9(d)(4), and 9(h). (ECF No. 129 at 22-23.)

Petitioner attempts to develop facts that were not previously presented in the state court proceedings. "*Pinholster* plainly bans an attempt to obtain review of the merits of claims presented in state court in light of facts that were not presented in state court", and "*Martinez* does not alter that conclusion." <u>Moore v. Mitchell</u>, 708 F.3d 760, 785 (6th Cir. 2013); *see* <u>Dixon v. Houk</u>, 737 F.3d 1003, 1012 n.2 (6th Cir. 2013) (<u>Martinez</u> does not allow the petitioner to circumvent the proper standard of review under <u>Pinholster</u> where the claims  adjudicated on the merits before the state courts), *reh'g & reh'g en banc denied* (Jan. 29, 2014).

Petitioner's claims in Amended Petition ¶¶ 8(h) and 9(b, d(4), & h) were adjudicated on the merits in the state courts and in this Court. (*See* ECF No. 91 at 19-73, 94.) <u>Martinez</u> does not allow Petitioner to circumvent <u>Pinholster</u> and allow consideration of evidence that was not developed and presented in the state courts. Petitioner is denied relief pursuant to <u>Martinez</u> on the claims in Amended Petition ¶¶ 8(h) and 9(b, d(4), & h).

**B. Ineffective Assistance of Appellate Counsel Claims (Amended Petition ¶¶ 10(b)(11))**

Petitioner argues that the equitable principles in <u>Martinez</u> apply to appellate counsel's failure to challenge all issues raised in Petitioner's habeas petition (Amended Petition ¶ 10(b)(11)). (ECF No. 129 at 23-27; *see* ECF No. 16 at 32-33, 35.) Specifically, Petitioner asserts:

> appellate counsel was ineffective for failing to raise the claims Mr. Henderson has raised regarding trial counsel's ineffectiveness in failing to investigate Mr. Henderson's paternal family history of serious mental illness, failing to investigate the traumatic brain injury Mr. Henderson suffered at age eleven, failing to review the discovery provided to them by the State and investigate the red flags signaling Mr. Henderson's serious mental illness contained therein, and then failing to present information regarding mental illness and brain injury to their experts.
>
> Appellate counsel was ineffective for failing to raise the issue that trial counsel's ineffectiveness led trial counsel to fail to properly advise Mr. Henderson regarding entry of a guilty plea and waiver of jury sentencing and, ultimately, to present the trial court with a false and misleading picture of Mr. Henderson. Appellate counsel was ineffective for failing to proffer the proof in support of those claims that Mr. Henderson has developed.

(ECF No. 129 at 24-25.) Petitioner asserts that his appellate counsel were ineffective for failing to raise claims regarding trial counsel's lack of qualifications (Claim 12); Petitioner's request for new counsel (Claim 12(c)); that the trial court erred in triple counting the aggravating facts surrounding the crime (Claim 15(c); and that Petitioner was not competent to enter a plea and waive jury sentencing (Claim 13). (<u>Id.</u> at 25-26.)

The holding in _Martinez_ does not encompass claims that appellate counsel were ineffective. _See_ _Martinez_, ___ U.S. at ___, 132 S. Ct. at 1319 ("_Coleman_ held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance at trial."). The Sixth Circuit in _Hodges v. Colson_, 727 F.3d 517, 531 (6th Cir. 2013), stated "[u]nder _Martinez_'s unambiguous holding our previous understanding of _Coleman_ in this regard is still the law - ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel." Petitioner is denied relief under _Martinez_ for his ineffective assistance of appellate counsel claims.

**C.    Other Substantive Claims (Amended Petition ¶¶ 8(a), 11(b), 12(a), 13, & 20)**

Petitioner argues that the equitable principles of _Martinez_ apply to substantive claims related to the appointment of qualified counsel, the grand jury, Petitioner's competence, and the guilty plea (_see_ Amended Petition ¶¶ 8(a), 11(b), 12(a), 13, & 20), for which ineffective assistance of trial and appellate counsel are the cause for procedural default. (ECF No. 129 at 27-38.) _Martinez_ is limited to ineffective assistance of trial counsel claims, _see_ supra pp. 6-7. The Sixth Circuit in _Hodges v. Colson_, 727 F.3d 517, 531 (6th Cir. 2013), denied relief from the procedural default of a juror misconduct claim based on _Martinez_, stating

> The Court in *Martinez* purported to craft a narrow
> exception to *Coleman.* We will assume that the Supreme
> Court meant exactly what it wrote: "*Coleman* held that an
> attorney's negligence in a post-conviction proceeding
> does not establish cause, and this remains true *except* as
> to initial-review collateral proceedings for claims of
> ineffective assistance of counsel *at trial."*

Id. (quoting Martinez, 132 S. Ct. at 1316 (internal citations

omitted)). The Court in Hodges also denied Martinez relief for the

procedural default of a substantive competency claim. Id. at 540.

In Olmos v. Ryan, No. CV-11-00344-PHX-GMS, 2013 WL 3199831, at

*9 (D. Ariz. June 24, 2013), the petitioner argued that he

"received ineffective assistance of counsel at the first post-

conviction relief proceeding when counsel there failed to argue

that trial/appellate counsel was ineffective for failing to argue

that the prosecution's peremptory strikes were unconstitutional."

The petitioner argued that the ineffective assistance of post-

conviction counsel "then serves as cause to excuse the default of

the claim that trial/appellate counsel was ineffective, which then

serves as cause to excuse Olmos' default of the underlying claim."

Id. The Court stated that "Olmos attempts to derive support for the

viability of this labyrinthine causal chain from *Martinez v. Ryan,*

but that reliance is misplaced." Id. at *10. The court stated that

this is not a claim of ineffective assistance of counsel, but a

substantive claim of a constitutional violation that was defaulted

when the petitioner failed to raise it on direct review. Id. The

court rejected Olmos' attempt "to extend Martinez to situations

where the ineffective assistance claim is merely the excuse for a procedural default - not the base claim itself" and cited his argument as a "dizzying chain of excuses" for his failure to exhaust his substantive claims. <u>Id.</u>

Similarly, this Court finds no reason to extend the limited holding in <u>Martinez</u> to claims other than ineffective assistance of trial counsel claims.[4] Petitioner is denied relief under <u>Martinez</u> for procedurally defaulted substantive claims other than ineffective assistance of trial counsel claims.

### D. Procedurally Defaulted Ineffective Assistance of Trial Counsel Claims (Amended Petition ¶¶ 9(f)(1)(v) & 9(n))

As stated supra pp. 6-7, <u>Martinez</u> provides petitioners relief from the procedural default of ineffective assistance of trial counsel claims where there was either no post-conviction counsel or post-conviction counsel were ineffective. There is no dispute that the claims in Amended Petition ¶¶ 9(f)(1)(v) and 9(n) were determined to be procedurally defaulted.[5] The Court will now determine whether these claims are "substantial" under <u>Martinez</u>.

To be "substantial" under <u>Martinez</u>, a claim must have "some merit" based on the controlling standard for ineffective assistance of counsel stated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

---

[4]     Petitioner's allegations in Amended Petition ¶ 8(a) were denied on the merits, not on the basis of procedural default. (ECF No. 72 at 35-47, 63, 114.) Therefore, <u>Martinez</u> is inapplicable and would not provide Petitioner with relief.

[5]     These claims were not raised in any of the state post-conviction proceedings. (*See* ECF No. 55-1 at 10.) The Court held that the claims were not exhausted and procedural defaulted. (*See* ECF No. 72 at 69-71.)

Martinez, ___ U.S. at ___, 132 S. Ct. at 1318-1319. To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 787 (2011) (citing Strickland, 466 U.S. at 689). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" Id. (quoting Strickland, 466 U.S. at 687).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.[6] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" Richter, ___ U.S. at ___, 131 S. Ct. at 787-88 (quoting Strickland, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant

---

[6] "[A] court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id.

of a fair trial, a trial whose result is reliable.'" Id. (quoting Strickland, 466 U.S. at 687).

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S. Ct. 2052; see also Bell v. Cone, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S. Ct. 2052.

Richter, ___ U.S. at ___, 131 S. Ct. at 788.

Petitioner argues that trial counsel's failures resulted in his plea and waiver of a jury for sentencing. (ECF No. 129 at 6.) He asserts that his trial counsel did not: (1) know the prevailing professional norms in the field of capital representation; (2) hire qualified experts to complete a thorough "biopsychosocial" evaluation; (3) complete a "biopsychosocial" evaluation or social history; (4) give the experts needed information for a correct diagnosis; (5) prepare experts to testify about Petitioner's

serious mental illness and brain dysfunction; and (6) as a result, did not have a case to present at trial or sentencing. (Id.) Petitioner asserts that, had counsel performed adequately and developed proof of his "familially linked" serious mental illness and brain damage, there is a reasonable probability that counsel would have recognized that Petitioner was not competent, adjudicated his incompetency, and not have urged Petitioner to plead guilty. (Id.)

Petitioner contends that trial counsel presented such "fundamentally incomplete" information at sentencing that the resulting picture of Petitioner weighed by the trial court was false. (Id.) Petitioner asserts that the "false picture" was the result of counsel's failure to conduct a rudimentary investigation, including failure to identify and interview Petitioner's father Elton Henderson, investigate and prepare appropriate witnesses, review discovery materials including evidence of Petitioner's mental decompensation and criminal history, and interview any witnesses related to Petitioner's criminal history. (Id. at 6-7.)

Petitioner argues that the "false picture" that emerged was that Petitioner participated in the spelling bee and won the "Good Helper Award" in elementary school, was a basketball player, and a product of an intact family. (Id. at 7.) His trial counsel argued that he was "a young man who had a lot going for him", but some unspecified occurrence happened in Petitioner's life that brought

Petitioner to "where we are today." (Id. at 8.) Petitioner's trial counsel argued that he was under extreme duress and could not appreciate the wrongfulness of his conduct without proof or even speculation about what caused Petitioner's behavior. (Id.)

Petitioner asserts that the State seized on his counsel's depiction of him as smart and well-adjusted to argue for the death penalty:

> He says, my client is a smart fellow; he had above-average grades; he had the highest scores in his class in spelling and geography and math; he comes from a loving, two-parent family; he had all the best opportunities. But they say that because Ms. Johnson did not at some point intervene to some unspecified problems, which never even came out in the proof that was brought out in school, that somehow he was not afforded the treatment, which at any early stage would have kept him from the murder of Tommy Bishop. I don't believe that is a mitigating circumstance, if it please the court --- the lack of intervention by a loving and attentive mother, to what has not even been described as being any kind of problem; certainly nothing that manifested itself in any kind of prior mental history of Mr. Henderson.

(ECF No. 129 at 9; ECF No. 20-5 at PageID 352.)

Petitioner argues that the true picture of his life was very different. (ECF No. 129 at 9.) The truth is that Petitioner had never met his biological father who impregnated his mother at 14 and whose family had a history of serious mental illness. (Id. at 7-9.) Petitioner contends that his mental illness stemmed from genetically inherited rapid-cycling Bipolar I Disorder and from a head injury when he was hit by a car while riding a bike as a child. (Id. at 9.) Petitioner asserts that his brain, already compromised by low brain

17

volume, atrophied in the frontal and parietal lobes as a result of the injury. (Id.) Petitioner states that his mental illness did not begin to progress until his late teen years when he "began to lose control of his impulses and was increasingly overcome by mania and altered perception of reality." (Id. at 9-10.) Petitioner asserts that the true picture of his life is one "of a less morally culpable man with a genetically-transmitted, severe mental illness (rapid-cycling Biploar I Disorder) that 'combines the most disruptive symptoms of the depressed and manic phase' and results in the 'simultaneous expression of cognitive deficits, impaired judgment, and behavior disruption'; a traumatic brain injury that left his brain atrophied, and also affecting his cognition, ability to control his impulses, and impairing his judgment; and generation after generation of relatives who suffer from the same severe mental illness." (Id. at 10 (citation omitted); see ECF No. 68-2 at PageID 4002; see also ECF No. 68-1.) Petitioner asserts that this "powerful mitigation" shows his "pitiable state" and "explains the truly senseless nature of his crime, thereby lessening the power of the aggravating circumstances." (ECF No. 129 at 10.)

### 1. Failure to Educate Themselves (Amended Petition ¶ 9(f)(1)(v))

In Amended Petition ¶ 9(f)(1)(v), Petitioner alleges:

> Counsel failed to educate themselves concerning developments in the field of capital case defense work and were unaware of prevailing professional norms, and thus failed to identify and procure the experts necessary to develop, discover, explain, and present available

mitigation themes or evidence, [s]ee Guideline 8.1 and
commentary, ABA Guidelines for Death Penalty Cases:

1) Such evidence and experts include, but are not
limited to: . . .

v) expert assistance to develop family and
community deficits affecting the psychological
development of Mr. Henderson.

(ECF No. 16 at 21-22.) Petitioner did not develop the facts
surrounding this claim in the Amended Petition or in addressing
summary judgment and did not define which experts were needed and
which family and community deficits should have been developed. (*See*
ECF No. 16 at 21-22; *see* ECF No. 68 at 120-129.) Petitioner argued
that his claim was exhausted under <u>Vasquez v. Hillery</u>, 474 U.S. 254,
258, 106 S. Ct. 617, 620, 88 L. Ed 2d 598 (1986), because the
emphasis of different facts in his federal claims did not result in
procedural default and that Respondent engaged in "hyper-technical
hairsplitting." (ECF No. 68 at 119-120.)

Now, Petitioner argues that neither of his court-appointed
counsel attended training on capital defense despite the
availability of continuing legal education seminars, journal
articles, books on capital sentencing preparation, and a practice
guide. (ECF No. 129 at 11-12.) Petitioner asserts that counsel
thought they could just hire an "expert" - Julie Fenyes, the
mitigation specialist/jury consultant, to do the job. (<u>Id.</u> at 11-
12.) He argues that counsel abdicated their duty to Fenyes, offered

19

her no guidance, and showed no familiarity with the range of mitigation evidence to be explored. (Id. at 12-13.)

Petitioner argues that Fenyes was not an adequate expert. (Id. at 13.) He contends that her work was "completely deficient"; that she failed to identify and interview Petitioner's father Elton Henderson; and that, as a result, she completely missed a "wealth of mitigating information" about Elton Henderson's family mental health history. (Id.) Petitioner contends that Fenyes' failures deprived him of a competent psychological evaluation because "[h]ad counsel hired an appropriate mitigation expert and learned of Henderson's paternal family mental health history, counsel would have realized the necessity of hiring a psychiatrist." (Id. at 14.)

Petitioner asserts that a competent mitigation expert would have been able to provide complete and correct information related to Petitioner's head trauma to Lynn Zager, a forensic psychologist who testified at sentencing, who would have then recommended further neurological testing. (Id.) Petitioner asserts that counsel's failure to identify and hire a competent social historian eviscerated his chance to present accurate, mitigating evidence at sentencing. (Id.) He argues that "[b]ut for the ineffectiveness of counsel – that is to say, had counsel discovered the wealth of mitigating evidence of Mr. Henderson's serious mental illness and brain disorder . . . there is a reasonable probability that Mr.

Henderson would not have pled guilty and would have insisted on going to trial, including a sentencing trial by jury." (Id.)

The themes of counsel's failure to educate themselves, abdication of their duties related to the mitigation phase to Fenyes, Fenyes' inadequate mitigation investigation, the failure to identify and investigate Elton Henderson, and the resulting failure of not having adequate information to provide mental health experts that Petitioner now asserts as part of his claim in ¶ 9(f)(1)(v) were addressed in the state court and/or this Court's prior rulings on the merits.

### a. Failure to Educate

The Court addressed a similar guilt phase claim asserted in Amended Petition ¶ 8(c) that trial counsel failed to educate themselves about issues that might be presented as a defense. (*See* ECF No. 91 at 15-17.) The Court stated:

> a. Counsel's Education and Qualifications
>
> In ¶ 8(c) of the amended petition, Henderson alleged that his trial counsel failed to educate themselves about issues that might be presented as a defense and failed to investigate and develop available information and locate appropriate expert and lay witnesses to present a defense. (ECF No. 16 at 6.) The Tennessee Court of Criminal Appeals stated:
>
>> The petitioner next asserts that trial counsel were deficient by their failure to stay abreast of developments in capital representation. The petitioner argues that trial counsel's failures impaired their ability to work with experts properly and ensure that the experts were performing the necessary tasks. In support of his position, the petitioner asserts that both

> Mr. Mosier and Mr. Johnston admitted their
> deficiency regarding working with experts. The
> petitioner asserts that this deficiency
> resulted in the loss of vital mitigation
> evidence. As stated earlier, issues addressing
> the failure to present mitigation evidence will
> be addressed as such. Our review as to this
> claim is merely as to whether Mr. Mosier's and
> Mr. Johnston's failure to inform themselves of
> developments in capital litigation constituted
> deficient performance. The record reflects that
> Mr. Mosier had previous experience in capital
> litigation. Additionally, his testimony
> established that he was familiar with the use
> of experts and that the experts in this matter
> were hand-selected by him. The petitioner has
> failed to make specific allegations referencing
> the developments in the area of capital
> litigation of which trial counsel was unaware.
> Rather, the petitioner relies upon alleged
> deficiencies in the area of mitigation proof.
> We refuse to adopt a per se finding of
> deficiency based upon an allegation of
> counsel's lack of knowledge regarding recent
> developments in the law, especially in light of
> the absence of any reference by the petitioner
> of what legal developments counsel was
> allegedly unaware. The petitioner is not
> entitled to relief as to this claim.

Henderson v. State, No. W2003-01545-CCA-R3-PD, 2005 WL
1541855, at *40 (Tenn. Crim. App. June 25, 2005). The
court also rejected Henderson's assertions that Johnston
and Mosier were unqualified to represent Henderson based
on their lack of experience and the fact that their
qualifications did not comply with Tennessee Supreme
Court Rule 13. Id. at **32-33. This Court previously
rejected Henderson's habeas claims that his counsel
failed to satisfy the standards for capital
representation. (ECF No. 72 at 39-47.)

(ECF No. 91 at 15-17.) Petitioner failed to argue the merits of his

claim. (Id. at 18.) The Court found that Henderson could not

demonstrate prejudice because of the overwhelming evidence of his

guilt and that Petitioner was not entitled to habeas relief related

to the Tennessee Court of Criminal Appeals' determination of the claim in Amended Petition ¶ 8(c). (Id. at 18-19.)

Counsel's performance is the measure upon which the Court determines whether there was ineffective assistance, not counsel's lack of education. *See* United States v. Cronic, 466 U.S. 648, 665 (1984) ("The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation.") Counsel's failure to educate themselves must be accompanied by unreasonable performance and prejudice to make out a claim of ineffective assistance of counsel.

### b. Fenyes' Mitigation Investigation

Petitioner presented claims of ineffective assistance of counsel at sentencing in the post-conviction proceedings, asserting that his trial counsel failed to develop and introduce mitigation evidence. Henderson, 2005 WL 1541855, at *39-43. Frank Einstein, a self-employed sentencing consultant and mitigation specialist, testified about the purpose of mitigation and the deficiencies he saw in Fenyes' investigation. Id. at *9-11. The post-conviction court did not find ineffective assistance of counsel, but clearly acknowledged that counsel was not fully aware of much of the social history information presented in the post-conviction proceedings:

> Counsel allowed the investigative and mitigation expert to conduct their investigation and report to counsel their findings. It is true that trial counsel was not aware of all the history of mental illness in the Petitioner's family. Also true was that counsel was not

completely aware of some of the violent events that the Petitioner engaged in shortly before this incident. It is true that counsel was aware from the expert clinical psychologist that Petitioner was diagnosed with a personality disorder, not otherwise specified, with narcissistic traits. However, their expert did not see any bipolar tendency, and counsel, under the circumstances, acted in a competent manner in presenting this psychological proof to the Court. It is true that counsel's mitigation expert did not make as an extensive mitigation investigation as Post-conviction mitigation expert opined was necessary.

Id. at *21.

The post-conviction court determined that counsel was "not ineffective" because: (1) a mitigation investigation was conducted and witnesses testified on Petitioner's behalf[7]; (2) the post-conviction court "placed little weight on the testimony of Petitioner's mitigation expert, especially when he opined that it would take two to three years to do a proper mitigation investigation"; and (3) mitigation was difficult in this case and the findings presented "a double-edged sword." Id. The post-conviction court noted the change in Petitioner's behavior about two years before the murder, the vicious assault on Petitioner's girlfriend, Petitioner's felony conviction, the abduction of Petitioner's girlfriend's mother on several occasions, and the rape of her mother. Id. The post-conviction court noted the differences in diagnosis of mental illness, and the fact that psychiatrist William Kenner stated that "the details of Petitioner's various

---

[7]    In the penalty phase, the defense witnesses presented at trial were Petitioner, Petitioner's high school principal Miles Wilson, his mother Sally Johnson, and psychologist Lynn Zager. (See ECF No. 20-4 at PageID 764.)

assaults, abductions and rapes" would have to be fully explained to understand the nature of Petitioner's bipolar diagnosis. Id. The post-conviction court also found the statutory aggravating circumstances to be "simply overwhelming" and found that the proffered new mitigating testimony about Kenner's bipolar diagnosis only reinforced the Court's opinion that the aggravating circumstance outweighed the mitigation evidence. Id. The post-conviction court stated,

> the evidence presented regarding the defendant's abduction of his girlfriend's mother, the rapes, the assaults, lead the Court to the conclusion that the Petitioner's acts were calculated, cold and deliberate. These are the same calculated and deliberate actions that led to the death of Tommy Bishop. Whether or not they were the result of a bipolar condition would not have changed the Court's decision to impose a sentence of death.

Id.

This Court addressed that claim as it relates to Petitioner's habeas allegations that counsel failed to properly investigate and prepare for the sentencing hearing (¶ 9(b)); talk with Petitioner about his social history or background (¶ 9(c)); investigate and develop evidence about Petitioner's brain damage (¶ 9(d)(4)); educate themselves about Zager's diagnosis of Petitioner as having narcissistic personality disorder (¶ 9(e)); identify and procure a psychiatrist and experts for neurological testing and neuropsychological testing (¶ 9(f)(1)); object to the trial court's request to confer with Fenyes (¶ 9(h)); and develop a theory of

mitigation (¶ 9(k)). (*See* ECF No. 16 at 12-32; *see* ECF No. 91 at 36-72.) The Court stated "[t]here were obvious deficiencies in the social history gathered by the defense team, regardless of whether that information was gathered by counsel or by Fenyes and [investigator Tammy] Askew." (ECF No. 91 at 54-55, 58-59.) The Court stated,

> The majority of the mitigation investigation in this case was conducted within the one week time period between the guilty plea and the sentencing hearing. Counsel clearly failed to develop a complete social history on Henderson, present this information to the experts, and use it to develop an appropriate mitigation theme. Counsel's performance was deficient at the sentencing phase.

> This Court must determine whether there is a reasonable probability that there would have been a different outcome at sentencing if a more complete picture of Henderson's behavior, bipolar disorder, and mental deficits had been presented to the trial court. In determining that Henderson was not prejudiced by counsel's performance, the Tennessee Court of Criminal Appeals placed great emphasis on the fact that the trial judge found that the evidence of Henderson's family history of mental illness and his own diagnosis of bipolar disorder 2 would not have changed the results of the sentencing hearing. Henderson, 2005 WL 1541[8]55, at *43.

> During the post-conviction proceedings, Judge Blackwood was made aware of undiscovered mitigating evidence. Blackwood acknowledged that counsel was not aware of Henderson's family's history of mental illness or the violent events that Henderson engaged in shortly before this incident. (ECF No. 22-8 at 77.) Blackwood stated that this case was one where finding mitigation was difficult and presenting mitigation evidence was "a double-edged sword." (Id.) Judge Blackwood determined that the additional mitigation evidence would not have changed his sentencing determination: . . . .

(ECF No. 91 at 65-66 (footnote omitted)). The Court noted that "more limited investigation into a defendant's behavior" was justified where the evidence presented would have a "double edge" and found that when "presented with the overwhelming evidence of the aggravating factors and the potential detrimental effect of introducing additional evidence about Henderson's criminal behavior in an attempt to mitigate his sentence. The double-edged nature of the new mitigation evidence does not establish a reasonable probability that the outcome at sentencing would change." (Id. at 70.)

### c.  Elton Henderson

Information related to Petitioner's biological father Elton Henderson was not developed until the latter stages of Petitioner's litigation.

#### (1)  Trial

At trial, Petitioner's mother Sally Johnson testified that she was 15 years old when Petitioner was born. (ECF No. 20-5 at PageID 293.) There was no testimony at trial identifying Elton Henderson as Petitioner's biological father or about his family.

#### (2)  Post-Conviction Proceedings

Elton Henderson's half-sister Margaret Henderson Simmons testified about Petitioner's father and his family in the post-conviction proceedings. Henderson, 2005 WL 1541855, at *14. (ECF No. 23-4 at PageID 3225-27, 3314-21.) Simmons testified that she and

Elton Henderson have the same mother Vester Hill[8] and that she and her mother were separated when she was a child. (Id. at PageID 3314-15.) Hill began to live with Simmons after Hill was diagnosed in 1990 or 1991 as "manic depressed." (Id. at PageID 3315.) Simmons takes cares of her mother "because she doesn't do anything but just sit all day in one place, and go from the bathroom to the kitchen, and that's it." (Id. at PageID 3316.) Simmons authorized access to Hill's mental health records, which were included as an exhibit to the post-conviction record. (Id.)[9]

Simmons testified about her maternal grandmother Novella Henderson who lived into her 90s but never went anywhere or did anything, just "sit in her chair all day in one place." (Id. at PageID 3316, 3319-20.) Novella never left the house. (Id. at PageID 3318.) Novella was "a strange lady. She wouldn't get in the bathtub, she wouldn't talk on the telephone, just different things. She didn't want to go near a gas stove and that type thing." (Id.) Simmons "was left" with Novella until she was about six or seven years old, and then Novella moved to Memphis with them when she was 85 and had broken her hip. (Id.)

---

[8]     The name is spelled "Veaster" in the post-conviction transcript. (ECF No. 23-4 at PageID 3315.)

[9]     Initially, Simmons' testimony was made as a proffer because of questions about the familial relation, but the court moved the testimony into proof after she testified that Elton Henderson told her that Petitioner was his son and that they had been communicating while Petitioner was in prison in Nashville. (ECF No. 23-4 at PageID 3320-21.)

The post-conviction trial court denied counsel's request for a recess to allow Elton Henderson to testify. (*See* <u>id.</u> at PageID 3313.) There appears to be no evidence presented related to Elton Henderson's behaviors or mental illness in the post-conviction proceedings.

### (3)  Federal Habeas Proceedings

In the federal habeas proceedings, Petitioner argues that his father appears to suffer from a mood disorder although he has not officially been diagnosed. (ECF No. 68 at 13.) Petitioner notes that neuropsychiatrist George Woods interviewed Petitioner's father and found "multiple signs of mood disorder, including 'grandiosity with a flight of ideas, pressured speech, mood lability, hypersexuality, and impaired judgment.'" (<u>Id.</u>; *see* ECF No. 68-2 at PageID 3996-3997.)

Petitioner argued, as part of his allegations in Amended Petition ¶¶ 9(d)(1-3) and 9(j) that counsel failed to investigate and develop evidence about Petitioner's mental illness, that counsel did not investigate and develop evidence related to the history of mental illness in Petitioner's family, especially on the paternal side where Petitioner's great-grandmother, grandmother, and "likely his father" suffered manic depression and his paternal uncles suffered chronic depression. (ECF No. 68 at 29.) The Court denied relief based on the merits of these claims. (ECF No. 72 at 85-98.)

Petitioner presented information about his father and other family members on the paternal side to support the motion for reconsideration of the Court's March 30, 2011 order granting in part and denying in part Respondent's motion for summary judgment. (*See* ECF No. 74.) Petitioner presented the declaration of Ann Walker-King, an investigator in the Capital Habeas Unit at the Office of the Federal Public Defender for the Middle District of Tennessee who interviewed Elton Henderson in April 2008. (ECF No. 74-4.)[10]

Walker-King stated that Elton Henderson expressed worry for Petitioner "because of his talent" and stated that he believes life is harder for a person the more talented they are. (Id. at PageID 4226.) Elton claimed that there was a conspiracy against Petitioner and commented "that when you are in the sports arena, like Kennath is, people know how to dig ditches for you." (Id. at PageID 4226-4227.) Elton had heard that Petitioner was as good as Kobe Bryant and would have been the next Michael Jordan. (Id. at PageID 4226.)

Elton was about 22 when he met Petitioner's mother Sally Johnson, who was then 14. (Id. at PageID 4227.) He said that Johnson's stepmother did not want him around. (Id.) First, he stated that he and Sally were "in love", but then stated that she really loved him. (Id.) Elton said that he did not care about Johnson's pregnancy and took no responsibility when Petitioner was born. (Id.)

---

[10]    Walker-King presented a declaration dated July 24, 2008, in response to the motion for summary judgment, but it did not mention Elton Henderson or issues related to mental illness in Petitioner's family although this information was available from the April 2008 interview. (*See* ECF No. 68-7.)

Elton claims that he had two other sons born at almost the same time as Petitioner, and the girls were jealous of each other until one day he saw them walking together. (Id.) He moved to Memphis after his three sons (Kennath, Chris, and Charles) were born. (Id.; *see* ECF No. 74-5 at PageID 4232.)

Elton and Charles' mother Lillian Rhodes were cousins, and Charles was born with deformities and had difficulty in school. (ECF No. 74-4 at PageID 4227.) Elton said they continued the relationship after learning that they were cousins. (Id. at PageID 4228.) Elton and Rhodes had a second child Tameka[11], who unlike Charles, was sharp. (Id.)

Walker-King said that Elton Henderson continuously talked about his sexual history and preferences and assumed that all the women he had been with would want to continue a relationship with him. (Id.) Elton admitted to having a preference for young girls, about fifteen years old, but "not necessarily as young as the twelve year old he was convicted of raping in 1988." (Id.) Elton explained "that he really hadn't meant to have sex with the twelve year old girl, because, at the time he 'had his eye on' his girlfriend's fifteen year old daughter. The twelve year old 'just happened to be there.'" (Id.) Elton said that it is common that men with a woman and her daughter and that the daughter may give the mother's boyfriend "a signal." (Id.) Walker-King described Elton's conversations bout

---

[11]    The name is also spelled "Tomeka" in some documents, but the correct spelling appears to be "Tameka." (*See* ECF No. 74-8 & 129-9.)

sexual assault and molestation as "matter of fact" with "no emotion or empathy." (Id.)

Elton Henderson never saw his own father Herman Greer. (Id.) He was told that Greer carried two or three pistols. (Id.) Elton believes that Greer was "frightened" out of town because he was a witness to something done by a notorious person. (Id.)

Elton's mother Vester Hill had nine children. (Id. at PageID 4229.) Hill, Elton, and three older children lived in the country about eleven miles from Somerville, Tennessee and were sharecroppers. (Id.) He moved to Memphis in about 1974. (Id.) When asked about mental illness in his family, Elton said that his mother "lost equilibrium" and was given medicine that made her more depressed. (Id. at PageID 4230.)

Elton claimed that he was a talented singer and artist. (Id. at PageID 4227.) He has not held any job for long because he is talented. (Id. at PageID 4229.) He says that he is happiest when singing and rehearsing and has almost reached "CD status". (Id.) He expects to be "an overnight success." (Id.) He sings solo at church sometimes and sang the 23rd Psalm, which was later aired on the Montell Williams Show. (Id.) He claims to have performed once at the Memphis in May Music Festival and to have won a talent performance there. (Id.)

Elton Henderson described himself as a "leader" and says that he "goes in at the bottom and moves to the top." (Id.) He says that he was "considered like staff" when he was incarcerated. (Id.)

Walker-King stated that, although they were in a public place, Elton became more overtly sexual as the interview progressed, and his manner was "disconcerting" and "increasingly uncomfortable." (Id. at PageID 4228.) She described him as "profoundly lacking in boundaries and self-awareness" with "no appreciation for the reprehensible nature of his expressed opinions nor for the inappropriateness of sharing them with a female investigator whom he had just met." (Id.) Walker-King stated that Elton called her on her work cell phone at about midnight, and she told him that it was inappropriate to call her that time of night. (Id. at PageID 4230.) She thought that he was under the influence. (Id.)

Petitioner presented the declaration of Raymond Henderson, Elton Henderson's half-brother. (ECF No. 74-5.) Elton and Raymond have the same mother, but Elton was the only child of Herman Greer. (Id. at PageID 4231.) Raymond states, "[e]veryone agrees Mr. Greer was crazy." (Id.) Greer lived in Memphis and was known to drink a lot and get into fights. (Id.)

Raymond, Elton, their brother William, and their sister Margaret Henderson [Simmons] grew up in Somerville, Tennessee at their grandparents' home on the Fowler Plantation. (Id.) Their mother lived with them until Raymond was nine, and then she moved to Memphis. (Id.) The boys stayed on the plantation to work with their grandparents as sharecroppers, but later Margaret moved to

Memphis with their mother. (Id.) Elton is about seven years younger than Raymond. (Id.)

Raymond believes that Elton's mental illness began around age fifteen. (Id. at 1.) Raymond moved to Memphis after he graduated from high school and remembers his grandmother calling him upset because Elton was drinking heavily, had no memory of his actions when he was drunk, and "behaved really inappropriately by having sex with young girls." (Id.) Raymond stated that Elton "raped our mother's sister, Aunt Channie Trotter, who was about sixty years old at the time" while Elton was still in high school and living with their grandparents. (Id.) The rape was never reported to the authorities. (Id. at PageID 4231-4232.)

Elton has lived with Raymond at various times in his adult life. (Id. at PageID 4232.) Raymond describes Elton's behavior as "very weird." (Id.) Elton hid all of the towels and silverware in the house under his bed in a sack. (Id.) He kept a stool by his bedroom window and spent long hours staring out the window. (Id.) He used his food stamps, like a child, to buy candy, cookies, and ice cream that he ate for breakfast. (Id.)

Raymond became concerned when Elton started "seeing visions of Jesus by the fireplace." (Id.) Raymond stated that the visions were real to Elton. (Id.) Raymond said "that Elton thought he was a famous singer and asked people to go on tour with him." (Id.) He concluded, "Elton is just messed up in the mind." (Id.)

Raymond talked about Elton's "wild and loose" sexual behavior and the children he fathered. (Id. at PageID 4232.) Raymond stated that Elton was convicted of rape of a twelve year old girl in 1988, which was very troubling to the rest of the family. (Id.) Raymond said that "not too long ago, Elton called our sister Carolyn and asked her 'What do you think about having sex with your brother?'" (Id.) Carolyn called Raymond to tell him what Elton said and talk about "how crazy he is." (Id.)

Elton drag-raced and engaged in a lot of risky behaviors. (Id.) He drove off the road in a cotton field, and they took him to the hospital "because he seemed so crazy." (Id.)

Raymond took Elton for a mental evaluation because his behavior was "so bad." (Id.) Elton sneaked out of the house when they were getting ready, and Raymond found him a few blocks away and put him in the car. (Id.) Raymond waited for him while the counselor interviewed him, but Elton left out of the meeting "and told the counselor both she and I were crazy, not him." (Id.)

Raymond says that Elton has four children, and he's heard that they are all crazy. (Id.) Raymond believes that Elton and his daughter Tameka Rhodes had a sexual relationship and described incidents at a motel and where Tameka and Elton were locked in a bedroom together. (Id. at PageID 4232-33.) Raymond states, "[f]rom what I've heard about Elton's son Kennath, who is on death row, he sounds a lot like Elton. I'm not a doctor, but it seems to me that

craziness runs in this family - from Herman to Elton and now to Kennath and Elton's other children." (Id. at PageID 4233.) Raymond stated that he and his siblings "recognize how seriously mentally ill [Elton] is." (Id.)

Margaret Henderson Simmons, Elton Henderson's half-brother, provided a declaration in the habeas proceedings in addition to her post-conviction testimony, *see* supra pp. 28-29. (ECF No. 74-6.) Simmons agreed with Raymond's belief that Elton's father "Herman Greer is crazy, just like Elton." (Id. at PageID 4234-35.) She again spoke of her mother Vester Hill's manic depression stating,

> [b]efore my mother was on medication, she talked out of her head. She was mean to other people and she was paranoid too. On one occasion, my mother was watching television and the television went off. She blamed my friend who was there with her and pulled a butcher knife on him.

(Id. at PageID 4234.)

Simmons again discussed her maternal grandmother Novella Henderson's behavior and concluded that she was mentally ill:

> She never went outside if she could avoid it because she was so paranoid. She also would not use a telephone, a gas stove, or any new technology. In fact, I never saw my grandmother's hair until she was about eighty years old because she always kept it hidden in a turban and wouldn't wash her hair or bathe. She later got wigs, but wore them over the turban. Our grandmother was never put on medication for mental illness, but we believed based on her paranoid behavior that she also suffered from severe mental illness.

(Id. at PageID 4234-35.)

Simmons also expressed concern about Elton's sexual behavior. She confirmed Raymond's accounts about the rape of an elderly aunt. (Id. at PageID 4235.) She had heard that Elton had forced himself sexually on different girls. (Id.) She said that Lillian Rhodes told her "that Elton had taken their ten year old daughter, T[a]meka, to a motel and had tried to penetrate her." (Id.)

Simmons described Elton as having "two different personalities." (Id.) She states the incident with Tameka "along with other things" made her believe he needed help, and she talked to her siblings about getting mental health treatment. (Id.)

She stated that Elton couldn't keep a job and could not stay focused to even do tasks around the house. (Id.) Elton would do well at jobs for awhile, "then he would break off and run away and hide in the house for two to three weeks. Elton then would go back to the job and act like nothing happened." (Id.)

Carolyn Acey, Elton Henderson's half-sister, provided a declaration in the habeas proceedings. (ECF No. 74-7.) She said that she lived in Memphis with her parents and full siblings when she was young, but she visited Somerville where she saw Elton. (Id. at PageID 4236.) Elton began trying to have sex with her when she was nine years old. (Id.) Elton told her that it was alright for them to have sex since they did not live in the same house and were not really relatives. (Id.) Carolyn said that Elton made sexual advances toward her friends, and while in college, two of her friends said

37

that Elton sexually attached them when they were younger. (Id.)
Carolyn stated,

> According to what I was told, Elton often gave girls
> rides home, and then would act like his car had broken
> down as an excuse to stop in a deserted place. He would
> then try to rape the girl. Elton didn't see anything
> wrong with trying to have sex or forcing himself sexually
> on my friends. Elton seemed to think his behavior was
> normal.

(Id.)

Carolyn Acey recounted the story that Elton had raped their
aunt. (Id.) Acey said she asked him directly if he had raped their
aunt. (Id.) He told her he believed he had but "blamed that behavior
on being drunk at the time." (Id.)

Acey states that after he moved to Memphis she "tried for us
to have a normal family relationship, but he is incapable of that,
due to his mental illness." (Id. at PageID 4237.) She states that
Elton "has always had – and still does have – sexual feelings for
me." (Id.) She states,

> Elton texts me at work at night. He asks me what I am
> doing and sends me sexual messages, telling me his
> desires. When I tell him that it is wrong for him to send
> me such messages, he says that sending these messages is
> part of his healing process.

(Id.)

Acey states that Elton used to excuse his behavior by saying
it was caused by drinking. (Id.) She states that, although he drank
heavily in his twenties, he no longer does, but he is "still very

mentally ill." (Id.) Elton "sees nothing wrong with his sexual fixation on minor children." (Id.)

Acey compares Elton's depressions to her mother's and grandmother's depressions. (Id.) She says that he "sits in a very dark room alone for hours with the blinds closed." (Id.) If you ask him why he is sitting there, he says there is nothing else to do. (Id.)

Around April 2011, Acey said that she took him to get psychiatric help. (Id.) He told the mental health professional that he doesn't need help, and there is nothing wrong with him. (Id.) Acey states that she is "very concerned" about Elton and believes that he has never been on medication. (Id.)

Tameka Rhodes, Elton Henderson's daughter and Petitioner's half-sister, at age 34, provided a declaration for the habeas proceedings. (ECF No. 74-8.) Rhodes' declaration described an incident where Elton Henderson sexually assaulted her when she was ten years old. (Id. at PageID 4238-39.) She told her mother, but her mother did not file a police report. (Id. at PageID 4239.) Her mother called the lady that Elton was dating and told her about the rape. (Id.) Her mother then found out that the police were looking for Elton because he had raped a girl who was visiting. (Id.)

Rhodes states that Elton sent her a letter while he was in prison and asked for "pictures of various parts of my body." (Id.)

He told her "before another man can try you, your dad is supposed to try you first." (Id.)

After Elton's release from prison, Rhodes tried to help him obtain insurance, but instead of discussing insurance, he sent her "a crude and disgusting text message" asking for sex. (Id.) She stated that she does not want him to know where she is or to be around her children and states that she is "still very afraid" of her father. (Id. at PageID 4239-4240.) She states, "Elton is evil. He may be able to sing and quote the Bible, but he is absolutely not to be trusted." (Id. at PageID 4240.)

Lillian Rhodes, the mother of two of Elton's children Charles and Tameka, provided a declaration in the habeas proceedings. (ECF No. 74-9.) She states that about the same time she gave birth to Charles, Sally Henderson (Johnson) gave birth to Petitioner Kennath Henderson, and Teresa Holloway gave to birth to Chris. (Id. at PageID 4241.) Lillian Rhodes described how she learned of the sexual assaults on her daughter Tameka. (Id. at 4241-4242.) Rhodes said that Elton told her that a father is supposed to "try" his daughter, meaning have sex with her, but she did not believe he would do something like that until he attacked Tameka. (Id. at PageID 4242.)

Augustus Neal, Elton Henderson's half-brother on his father's side, provided a declaration for the habeas proceedings. (ECF No.

74-10.)[12] He met Elton in prison, and they figured out they had the same father Herman Greer. (Id. at PageID 4242.) Greer came around about twice a year to check on Neal, gave him a $50 bill, and took him out to eat. (Id.) Greer had a new model Gran Torino each year, and Neal remembers thinking that if Greer could get a new car each year, he could give him more money. (Id.) Neal states that Greer was married and had five children with his wife. (Id.) The wife and children were "snooty and acted like they were better than his other children." (Id.)

Greer never wanted to be old. (Id.) He was a truck driver and a mechanic. (Id. at PageID 4243.) He would tell Neal, "You know I'm a pimp." (Id.) Greer thought he was important to a lot of women and considered it an accomplishment. (Id.) Greer dated a lot of women and had a lot of kids. (Id.)

Greer was happy around a lot of people, but he got depressed when he was alone. (Id.) He drank too much and would do risky things. (Id.) Greer stated that he believes "depression ran on my dad's side of the family." (Id.)

In conjunction with Amended Petition ¶ 9(b), the Court addressed the investigation into Petitioner's biological father Elton Henderson and the discovery of a family history of mental illness. (ECF No. 91 at 55-56.) The Court stated that,

---

[12]     Neal has been incarcerated since August 1993, according to his declaration. (ECF No. 74-10 at PageID 4242.)

[Margaret Henderson Simmons'] testimony demonstrates that there was mitigation evidence available about a history of mental illness on Henderson's paternal side of the family relevant to the determination of ineffective assistance of counsel. Although counsel experienced difficulties with Henderson's mother, there is no evidence that Henderson's trial counsel attempted to develop mitigation evidence from his father's side of the family. Counsel, contrary to the goal of mitigation, ignored the fact that Henderson was born when his mother was fifteen (15) years old and made every attempt to present Henderson's family with his stepfather as a normal nuclear family. Further, Einstein noted the fact that trial counsel failed to discover that family members on both sides of Henderson's family suffered mental illness, and the Tennessee Court of Criminal Appeals found that counsel was unaware of the history of mental illness in Henderson's family. Henderson, 2005 WL 1541855, at **10, 21.

(ECF No. 91 at 56 (footnotes omitted)).

Petitioner has recharacterized claims that have been considered on the merits in an attempt to allow additional evidence not presented in the state courts to be considered as part of a new claim under Martinez, see supra pp. 8-10. Petitioner is asking this Court to determine whether his trial counsel were ineffective for failure to investigate and present evidence related to his father Elton Henderson and the history of mental illness on the paternal side of his family including expert testimony about Petitioner's most recent diagnosis of rapid-cycling Bipolar I disorder and the familial relationship or "high genetic transmission" of and "incidence of inheriting" this particular mood disorder.[13] (See ECF

---

[13] Petitioner has not defined what "community deficits" at are at issue in Amended Petition ¶ 9(f)(1)(v), and the Court will not address this aspect of Petitioner's claim.

No. 68-2 at PageID 3996.) William Kenner, even without the additional information related to Elton Henderson and the paternal side of Petitioner's family, determined that Petitioner suffered from a major mental illness based in part on evidence of Petitioner's family history of mental illness. Henderson, 2005 WL 1541855, at *20. The additional information provided about Elton Henderson and Petitioner's paternal family history of mental illness involves substantial unchecked, reprehensible, criminal behavior - the same type of criminal behavior that creates the double-edged sword the post-conviction court saw with the diagnosis of Bipolar II disorder and also presented with the rapid-cycling bipolar I disorder which, as defined by Woods, is "the most destructive of the Bipolar subsets" combining "the most disruptive symptoms of the depressed and manic phase, creating atypical symptomatology that often destroys lives" and may result in "uncharacteristic violence." (*See* ECF No. 91 at 70; *see* ECF No. 68-2 at PageID 4002.)[14]

There was a guilty plea and overwhelming evidence of the four statutory aggravating factors that: (1) the defendant created a

---

[14]    Although there was limited evidence through the testimony of Margaret Henderson Simmons in the post-conviction record about Petitioner's paternal family history of mental illness, there was evidence of a family history of mental history on the maternal side including evidence of psychotic and schizophrenic disorders and mental health records of Glenn Johnson, Cora Lee Johnson, Hubert Henderson, and Herbert Henderson. (*See* ECF No. 23-3 at PageID 2216; *see also* ECF No. 23-6 at PageID 3494, 3498, 3523, 3532.)  This information raises the question of whether post-conviction counsel's performance constituted ineffective assistance where there was some substantial investigation of Petitioner's family history of mental illness. Even without Elton Henderson's testimony and the additional declarations provided in the habeas proceedings, Kenner determined that Petitioner suffered from a major mental illness based in part on evidence of Petitioner's family history of mental illness. Henderson, 2005 WL 1541855, at *20.

great risk of death to two or more persons during the act of murder; (2) the murder was committed for the purpose of avoiding an arrest; (3) the murder was committed during the defendant's escape from lawful custody; and (4) the murder was committed against a law enforcement officer who was engaged in the performance of official duties. *See* State v. Henderson, 24 S.W.3d 307, 312-314 (Tenn. 2000). There was evidence available in the state court that Petitioner had an "unspecified personality disorder which exhibited some narcissistic and anti-social traits" or Bipolar II, depending on whether you believe Zager and clinical psychologist Pamela Auble or Kenner, and that Petitioner suffered neuropsychological deficits. *See* Henderson, 2005 WL 1541855, at *3, 16-20.[15] The criminal behaviors and family history associated with and leading to a diagnosis of Petitioner's mental disorder create a double edged sword for Petitioner, even with the diagnosis of rapid-cycling Bipolar I disorder from Woods and neuropsychiatrist Ruben Gur's conclusion that Petitioner suffered abnormalities in brain function in regions relevant to behavior. (*See* ECF No. 68-1 at 4.) In fact, the diagnosis of rapid-cycling Bipolar I disorder along with

---

[15]     The Court notes that Kenner distinguished Bipolar I and Bipolar II in his testimony, stating that "[i]ndividuals who have the Type 1, in which they are floridly manic, can have quite a number of symptoms that indicate that they have – their perception of reality is different from that of other people's. They will hear things that aren't there, see things that aren't there, believe that folks are after them. They will believe themselves to be, you know, the long-lost son of George Bush, Sr., or somebody equally important, . . . . And they'll build a whole sort of delusion around that idea." (ECF No. 23-4 at PageID 3284-3285.) He described Bipolar II as possibly having "devastating effects" but being "more subtle." (Id. at PageID 3285-86.) He further stated "there are lots of folks who don't rape, murder, kill who have Bipolar 2." (Id. at PageID 3286.)

Petitioner's history of escape from incarceration, assaults, abductions, rapes, and the shooting of Bishop at point-blank range while he was unconscious makes Petitioner seem even more dangerous than the previous diagnoses. Petitioner can not demonstrate prejudice and has not demonstrated that his claim related to trial counsel's failure to educate themselves about family and community deficits is substantial under <u>Martinez</u>.

### 2. Failure to Interview and Prepare Defense Witnesses (Amended Petition ¶ 9(n))

Petitioner alleged:

> Counsel did not interview and adequately prepare defense witnesses, resulting in the failure to present to the Court a complete picture of Kennath Henderson. <u>See</u> Guideline 10.11 and commentary, ABA Guidelines for Death Penalty Cases.

(ECF No. 16 at 26.) The Court found the claim to be unexhausted and procedurally defaulted:

> The claim in ¶ 9(n) that counsel did not interview and adequately prepare defense witnesses which resulted in the failure to present to the Court a complete picture of him (ECF No. 16 at 26) was not exhausted in state court. Henderson, his mother Sally Johnson, Miles Wilson, and Zager testified on his behalf at the sentencing hearing. (<u>See</u> D.E. 20-5 at 6.) Henderson asserts that he exhausted this claim when he alleged in the post-conviction appellate brief that his counsel failed to develop a relationship with his mother Sally Johnson which "denied them critical information concerning the family dynamics" and his mental illness. (D.E. 68 at 118-19; <u>see</u> D.E. 23-15 at 74.) Although Henderson addressed his counsel's relationship with his mother, he failed to allege that counsel failed to prepare his mother or any other witness to testify. The claim in ¶ 9(n) was not exhausted and is procedurally defaulted.

(ECF No. 72 at 70-71 (footnote omitted).)

In relation to Amended Petition ¶ 9(n), Petitioner argues that counsel failed to: (a) interview or adequately prepare Elton Henderson or any witness to Elton Henderson's mental illness; (b) interview or prepare witnesses of Petitioner's aberrant behavior; and (c) adequately prepare Zager. (ECF No. 129 at 15-22.) Petitioner asserts that counsel's failure to identify, prepare, and present these witnesses undermines the reliability of the sentencing determination. (Id. at 21.) He contends that with the appropriate proof, at least one juror would have declined to impose the death sentence. (Id. at 22.)

### a.    Elton Henderson

Petitioner argues that counsel would have uncovered critical information necessary for the diagnosis of Petitioner's severe mental illness had they identified and interviewed Petitioner's family including his father Elton Henderson. (ECF No. 129 at 15.) Petitioner points out that Woods' report states that Petitioner's rapid-cycling Bipolar I Disorder was genetically inherited from his paternal family. (Id.) Petitioner asserts that although he is the only one in his family with this particular diagnosis, it is clear that the illness was genetically inherited because: (1) Elton Henderson's symptomatology is consistent with rapid-cycling Bipolar I Disorder[16] although he refuses mental health treatment; and (2)

_____

[16]    Elton Henderson's symptoms were described as "manic hypersexuality, reckless behavior, paranoid ideations, and altered perception of reality." (ECF
                                                                  (continued...)

Elton's mother Vester Hill was diagnosed with "manic depression", also with symptoms consistent with rapid-cycling Bipolar I Disorder. (Id. at 15-16.) Petitioner asserts that, instead of interviewing Petitioner's biological father or paternal relatives, counsel failed to find out who Petitioner's biological father was and told the court that Petitioner "did not come from a broken home." (Id. at 16.) Petitioner argues that the facts were that his mother was fourteen years old when he was born and that his parents never married or lived together. (Id.) Petitioner had not met his biological father. (Id.)

In Amended Petition ¶ 9(b)(1), Petitioner alleged that counsel failed to interview any witnesses apart from Petitioner's immediate family members and a few teachers. (ECF No. 16 at 12.) Petitioner alleged that important witnesses who counsel failed to interview included "[r]elatives of Mr. Henderson, who were aware of the history of mental illness in his extended family, which includes bipolar disorder, manic depression, and paranoid schizophrenia . . . ." (Id. at 13.) The Court addressed these allegations as it relates to the investigation of Elton Henderson, and noted that "the Tennessee Court of Criminal Appeals found that counsel was unaware of the history of mental illness in Henderson's family", see supra p. 43. (ECF No. 91 at 55-56; see id. at 47.) See Henderson, 2005 WL

16    (...continued)
No. 129 at 16; ECF No. 129-4 at PageID 4695-97.)

1541855, at *7, 10-11, 14, 20-21. This Court has determined that the allegations related to counsel's failures associated with the investigation of Elton Henderson and Petitioner's paternal family are not substantial, *see* supra pp. 28-46, are not substantial and not entitled to merits review under <u>Martinez</u>.

### b. Witnesses of Aberrant Behavior

Petitioner argues that counsel failed to conduct a cursory investigation and neglected to read the discovery that the State provided. (ECF No. 129 at 17.) Petitioner asserts that, had counsel reviewed the interview with Petitioner's former girlfriend Natonya Cobb from the Bureau of Alcohol, Tobacco and Firearms, counsel would have discovered that she was questioned extensively about her knowledge of Petitioner's repeated abduction and rape of her mother Shirley Cobb. (<u>Id.</u>) Petitioner contends that "[h]ad counsel performed this most basic task, *simply reading the discovery provided to him by the State*, counsel would have known, as everyone in the Fayetteville courthouse – except counsel – knew, that Mr. Henderson was accused of crimes which raised very obvious red flags about Kennath Henderson's mental health." (<u>Id.</u>) Petitioner further asserts that counsel would have had eyewitness proof of Petitioner's symptomatic behaviors upon which Zager could have relied in making an Axis I serious mental illness diagnosis if counsel had

interviewed and prepared Shirley Cobb, Ethel Shaw[17], Shirley Shelby, Tonya Whitmore, Tina Whitmore[18], and Michelle Sullivan[19] as witnesses. (Id.)

This Court addressed whether Petitioner's trial counsel read the discovery related to Petitioner's repeated abductions and rapes of Shirley Cobb or reviewed the offense report, documents, and videotape of Natonya Cobb in its analysis of Amended Petition ¶ 9(b). (ECF No. 91 at 57-58.) The Court stated that the defense team was "unaware of Henderson's criminal history, the bizarre nature of some of the incidents, and the fact that many of his victims were people he knew." (Id. at 58.) The Court stated "it is clear that

_____

[17]    Miles Wilson, the principal at Petitioner's high school, stated that Ethel (also spelled "Ethyl") Shaw, the school secretary, was attacked by a man wearing a mask who she believed to be Petitioner. (ECF No. 23-13 at PageID 3418.) However, Wilson did not testify at trial about this incident.

Petitioner's high school basketball coach Larry Ransom stated that Petitioner had a "crush" on Shaw (also referred to as "Ethyl Pearl" or "Pearl"), but Ransom "and everyone else doubted" Shaw's accusation. (Id.) Ransom testified in the post-conviction proceedings that Petitioner placed something in the driveway of the school secretary. Henderson, 2005 WL 1541855, at *12.

Shaw reported to the post-conviction investigators that Petitioner attacked her in December 1991 after a basketball game, that Sally Johnson was saying "stuff" about her after the attack, and that T.L. Johnson (Petitioner's stepfather) told her he was sorry it happened. (Id. at PageID 3419.)

Dr. Woods' report states that Henderson attacked Ethel Shaw, the school secretary. (ECF No. 68-2 at PageID 3999.)

[18]    In Petitioner's December 2013 brief, he spells the name "Whitamore".

[19]    Sullivan was described as Petitioner's girlfriend by post-conviction investigators. (ECF No. 23-13 at PageID 3420.) She met Petitioner while working at Target in Memphis, and he lived with her at her mother's house in Memphis for about a month in April 1994. (Id.) Petitioner borrowed her car, took her check book from her house, cashed $900 worth of checks from her account, and left the state in her car. (Id.) Dr. Woods' report states that Petitioner had a sexual relationship with Michelle Sullivan. (ECF No. 129-4 at 6.)

crucial aspects of Henderson's criminal background were not conveyed to Zager prior to trial." (Id.) The Court noted that "[t]here were obvious deficiencies in the social history gathered by the defense team, regardless of whether that information was gathered by counsel or by Fenyes and Askew." (Id. at 59.)

This Court, after review and consideration of the testimony presented in the post-conviction proceedings, determined that counsel's performance was deficient at the sentencing stage and noted that the post-conviction trial court determined that additional mitigation evidence would not have changed the sentencing determination. (ECF No. 91 at 65-66.) This Court ultimately found no merit to Petitioner's claim after being "presented with the overwhelming evidence of the aggravating factors and the potential detrimental effect of introducing additional evidence about Henderson's criminal behavior in an attempt to mitigate his sentence." (ECF No. 91 at 70.) The Court stated,

> The double-edged nature of the new mitigation evidence does not establish a reasonable probability that the outcome at sentencing would change."

(Id.)

The "complete picture" that Petitioner seeks to present is not favorable or otherwise likely to have changed the outcome of his sentencing. Petitioner can not demonstrate that he was prejudiced by counsel's failure to interview and prepare Petitioner's victims

as witnesses to testify in the sentencing hearing. Petitioner's claim is not substantial under <u>Martinez</u>.

Further, the Court notes that it would be difficult to find ineffective assistance of post-conviction counsel as cause for the procedural default. Petitioner's post-conviction counsel presented Shirley Shelby and Tonya and Tempie Whitmore as witnesses and used their testimony, along with information related to Shirley Cobb, and observations of their experiences with Petitioner to obtain a psychiatric diagnosis from Kenner. (*See* ECF No. 23-2 at PageID 2519.) *See* <u>Henderson</u>, 2005 WL 1541855, at *13-14, 18-19. The state post-conviction court was well aware of Petitioner's criminal acts involving these victims, how those facts tied into Kenner's diagnosis, and the necessity of presenting details of Petitioner's crimes "to fully explain the nature of Petitioner's "various assaults, abductions and rapes" to fully explain the diagnosis, *see* supra pp. 25-26. *See* <u>Henderson</u>, 2005 WL 1541855, at *21. Given post-conviction counsel's actions in presenting this mitigating testimony and the use of that testimony in relation to obtaining an expert opinion, the Court can not determine that post-conviction counsel's performance was either deficient or prejudicial to Petitioner, and therefore, Petitioner can not establish cause for procedural default by asserting ineffective assistance of post-conviction counsel.

### c.    Lynn Zager

Petitioner argues that trial counsel failed to interview and prepare psychologist Lynn Zager for the penalty phase of trial. (ECF No. 129 at 17-18.) Petitioner asserts that counsel had not conducted any mitigation investigation when Zager did her assessment, did not meet with or otherwise prepare Zager between November 1997 and July 1998, and in July 1998, informed Zager to be ready to testify at the sentencing hearing just one week later. (Id.) Petitioner argues that counsel's failure to provide Zager with relevant social history led her to mis-diagnose Petitioner and testify inaccurately at sentencing. (Id. at 18.) Petitioner notes that neither his counsel nor Zager were aware of Petitioner's prior crimes and family history of mental illness; with that information, Zager would have likely reached the correct diagnosis of rapid-cycling Bipolar I disorder. (Id. at 18-20.)

Petitioner further asserts that counsel failed to provide information necessary to contextualize Petitioner's traumatic brain injury which he suffered when he was hit by a car at age 11. (Id. at 20.) He contends that proof of his brain damage would have significantly mitigated his moral culpability for the crime. (Id. at 20.) Petitioner refers to Gur's report indicating that Petitioner's brain damage "impairs his ability to modulate his behavior in accordance with context and may specifically lead to dissociative states, such as the state he was in when he committed

the offenses." (ECF No. 129 at 20-21; ECF No. 129-5 at PageID 4711.) Petitioner further notes that Zager would have had Petitioner tested for brain injury if she had known of his history of increasingly erratic behavior. (ECF No. 129 at 21; ECF No. 129-14 at PageID 4737.)

Zager was employed to perform a forensic evaluation on Petitioner prior to trial. (ECF No. 20-5 at PageID 310.) She determined that Petitioner was competent to stand trial. (Id. at PageID 311.) Petitioner reported that he had a significant head injury where he had to be hospitalized, and Zager knew that medical and school records would be important to a comprehensive evaluation. (Id.) She next saw Petitioner on July 9, 1998, when she performed a current mental status evaluation to determine if there was significant change in his mental status and a brief clinical interview. (Id. at PageID 312.) Zager diagnosed Petitioner with a dissociative state and a personality disorder, not otherwise specified, with narcissistic traits and antisocial traits. Henderson, 2005 WL 1548155, at *18. (ECF No. 20-5 at PageID 317.) Zager testified that Petitioner acted "under duress, and that his judgment was not adequate." (Id. at PageID 321.) Still, Zager's opinion as to Petitioner's mental state was that he was not "substantially impaired" to the point of insanity, but his judgment was impaired:

My opinion in this case would be that he was not substantially impaired. I would not offer an opinion to the Court that he be considered insane at the time. However, I think his judgment was -- It would not reach where I could support insanity, but I think he was impaired at the time.

(Id. at PageID 322.)

This Court has acknowledged that Zager and Petitioner's trial counsel had not investigated and were not aware of many relevant facts about Petitioner's criminal background and family history, *see* supra pp. 50-51. (*See* ECF No. 91 at 58.) The Court also addressed Zager's representations in a declaration after she had reviewed additional information related to Petitioner and noted that she did not offer a different diagnosis. (ECF No. 91 at 60.) As late as May 2011, after Zager had been provided additional information about Petitioner, Zager states that, "based on the social history information and family history of mental illness provided to me by habeas counsel, the diagnosis of Dr. George Woods appears to be more accurate than the diagnosis I was able to provide in 1998." (ECF No. 77-3 at PageID 4323; ECF No. 129-14 at PageID 4737.) However, she did not change her diagnosis, but states "[h]ad I an opportunity to reevaluate Mr. Henderson, I would be able to determine whether it is appropriate to rule in the diagnosis of Bipolar Disorder." (ECF No. 77-3 at PageID 4323; ECF No. 129-14 at PageID 4737.)[20]

---

[20]    In the instant claim, Petitioner asserts that counsel failed to interview and prepare psychologist Lynn Zager for the penalty phase of trial. However, in a similar claim in Amended Petition ¶ 9(d)(4), Petitioner argues that counsel
(continued...)

Clearly, Zager was aware of the head injury and was able to determine, much like Woods, that Petitioner was in an altered "dissociative" state with impaired judgment at the time of the incident. Still, because Zager has not offered a different diagnosis, the Court finds no prejudice in Petitioner's claim that trial counsel failed to interview and prepare Zager for the penalty phase of trial.

The Court further notes that, in the post-conviction proceedings, Auble agreed with Zager's diagnosis as to Petitioner's narcissistic traits and antisocial personality. Id. Auble was unable to diagnosis Petitioner with an Axis I diagnosis of a major mental disorder. Id. Auble also performed a battery of tests on Petitioner and determined that Petitioner had neuropsychological deficits:

> To be exact, he has some difficulties learning information that he's told. That's a problem for him. He also had some problem in a test of manual dexterity, and he had some variable problems on tests which measure his ability to go back and forth between different ideas, to form hypotheses and test them, and to abstract reasoning.

> From the personality testing, [the petitioner] has a desire to present himself as a very normal, even maybe supernormal individual. He is likely to minimize or even be unaware of his own problems. He likes people and wants interaction with people.

Id. at *17. Auble determined that the neuropsychological deficits were significant because they affect his functioning, specifically

---

[20] (...continued)
failed to investigate his traumatic brain injury. (ECF No. 77 at 10-11.) In response to the claim, the Court notes that Zager did not provide a different diagnosis. (ECF No. 91 at 60-61.)

"his portrayal of himself and his family is inconsistent with reality" and he was not "aware of his own emotional dynamics." Id. Auble did not diagnose Petitioner with a bipolar disorder.

In the post-conviction proceedings, Kenner diagnosed Petitioner with Bipolar II. Id. at *42. Zager stated that Bipolar II is not inconsistent with the MMPI[21] administered to Petitioner. Id. at *16.

Woods, a neuropsychiatrist hired in relation to the habeas proceedings, diagnosed Petitioner with Bipolar I Disorder, which was in a rapid-cycling, mixed phase at the time of the offense and at the entry of his guilty plea and waiver of jury sentencing; Cognitive Disorder Not Otherwise Specified; a traumatic brain injury; and "uncharacteristically low brain volume." (ECF No. 68-2 at PageID 4007-4008; ECF No. 129-4 at PageID 4706-4707.) Woods described Petitioner as being in an altered mental state with impaired judgment during the incident. (ECF No. 68-2 at PageID 4006-4007.) Woods determined that these mental disorders "impaired ability to effectively weigh and deliberate due to [Petitioner's] brain deficits, and impaired judgment, precluded Mr. Henderson from conforming his behavior to the law and also from making a rational and voluntary, intelligent, and knowing waiver of his rights to a jury trial and waiver of his right to be sentenced by a jury." (ECF No. 129-4 at PageID 4707; ECF No. 68-2 at PageID 4008.) This Court previously found evidence from Woods' evaluations and reports to be

---

[21]    The "MMPI" is the Minnesota Multiphasic Personality Inventory.

barred by <u>Pinholster</u>. (ECF No. 91 at 36 n.14; <u>id.</u> at 56 n. 19; <u>id.</u> at 64-65 n. 24; <u>id.</u> at 76 n. 30.)

Gur concluded that:

Neuropsychological testing suggested dysfunction in behavioral domains related to frontal-parietal systems, worse on the left for frontal and worse on the right for parietal. MRI data indicated reduced volume in the frontal and parietal regions, with similar laterality to that suggested by the neuropsychological testing.

These results indicate abnormalities in brain function in regions relevant to behavior, especially related to executive functions (frontal), attention and comprehension of complex information (parietal), and the integration of self (right parietal). These abnormalities are of unclear etiology, but most likely related to anoxia or traumatic brain injury. By history, the blunt trauma and concussion sustained when Mr. Henderson was eleven could help explain his developmental deficits. Specifically, his complaint of a sore spot on the top left portion of his head is consistent with the behavioral image. The relevance of these abnormalities to his behavior during and subsequent to the crime was confirmed in a clinical interview. The combined information indicates that Mr. Henderson suffers from brain dysfunction that impairs his ability to modulate his behavior in accordance with context and may specifically lead to dissociative states, such as the state he was in when he committed the offenses.

(ECF No. 129-5 at PageID 4711.) The Court previously determined that consideration of Gur's report was barred by <u>Pinholster</u>. (ECF No. 91 at 59, 64-65 n.24.)

Although the diagnoses differ at trial, in the post-conviction proceedings, and as presented in the habeas proceedings, it is clear that there was agreement from the time of trial that Petitioner suffered a dissociative state with impaired judgment at the time of

the incident. The information uncovered about Petitioner's family and social history and incorporated and analyzed by experts to form what may be considered a more complete diagnosis of Petitioner's mental health still did not create a reasonable probability that the sentencing outcome would have been different. Petitioner suffered no prejudice, and his claim in Amended Petition ¶ 9(n) is not substantial under <u>Martinez</u>.

## IV.  CONCLUSION

Petitioner is not entitled to relief under <u>Martinez</u> either because his claims do not fall within the scope of <u>Martinez</u> or are not substantial under <u>Martinez</u>. As such, no further proceedings are required. The petition is DENIED.

## V.  APPEAL RIGHTS

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335 (2003). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Habeas Rule 11(a). A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required

showing. 28 U.S.C. §§ 2253(c)(2)-(3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 336 (internal quotation marks omitted). A COA does not require a showing that the appeal will succeed. Id. at 337. Courts should not issue a COA as a matter of course. Id.

The Court previously granted Petitioner a limited certificate of appealability and certified that a limited appeal would be taken in good faith with regard to the following issues:

> Ineffective Assistance of Counsel at Sentencing (Amended Petition ¶ 9)

> Incompetence to Enter a Guilty Plea and Waive Jury Sentencing (Amended Petition ¶ 13)

(ECF No. 91 at 94-96.) The previous grant still stands.

Reasonable jurists could not disagree about the remaining issues. The Court DENIES a certificate of appealability on the remaining issues in the petition.

Federal Rule of Appellate Procedure 24(a)(3) provides that a party who was permitted to proceed in forma pauperis in the district court may proceed on appeal in forma pauperis unless the district court certifies that an appeal would not be taken in good faith or otherwise denies leave to appeal in forma pauperis. The Court

CERTIFIES, pursuant to Fed. R. App. P. 24(a), that an appeal in this matter would be taken in good faith to the extent the appeal addresses the above-referenced issues for which the Court grants a certificate of appealability. An appeal that does not address these issues is not certified as taken in good faith, and Petitioner should follow the procedures of Fed. R. App. P. 24(a)(5) to obtain in forma pauperis status.

IT IS SO ORDERED this 8th day of May, 2014.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE